Thank you. Good afternoon. Good afternoon. Welcome to the zoom court call. Um, Ms. Palacio, am I saying that right? Perfect, thank you. You may proceed. May it please the court. My name is Grace Palacio and I represent the appellant Jennifer Reed. Pathways to Hope was a charity designed to help victims of sexual abuse by the Catholic Church. It was formed in 2004 by 15 Catholic orders who each contributed seed money to start the charity. The heads of these orders were called Provincials and made up the charity's board of trustees. In addition to the executive director. As executive director, she was in charge of day-to-day operations. After discussions with the Provincials, Ms. Reed would then offer the charity services to victims of sexual abuse for the purpose of their healing or compensation. These services included mental health counseling, financial compensation, relaxation strategies, substance abuse treatment, and even payment of their bills, tuition, transportation, groceries, and sometimes even cash. Ms. Reed paid for these services and for the operation of the charity through its bank accounts and credit card. In 2010, financial difficulties caused Pathways to shut down. In 2013, Ms. Reed was charged with three counts of theft based on the claim that she wrote checks on Pathways accounts without authority and one count of theft based on the claim that she exerted unauthorized control over the charity's accounts and credit card. These charges were not supported by the record. Ms. Reed's brief raises two issues. One, whether the trial court erred in denying the defense motion for a directed verdict where at the close of the state's evidence, there was no and two, whether this court must reverse Ms. Reed's convictions because the state failed to prove these thefts beyond a reasonable doubt. At the close of the state's evidence, the defense moved for a directed verdict after the state failed to present affirmative evidence that any of Ms. Reed's actions were done without authority. The trial court erred when it denied the motion for a directed verdict. The state's case established that as Executive Director, Ms. Reed discussed each case with the Provincials and that the Provincials approved all the charity's services and billing. However, the state did not present any of the Provincials as witnesses. As such, there was no testimony as to what they specifically authorized Ms. Reed to do in her capacity as Executive Director. Without such evidence, the state could not establish that any of her actions were done without authority or that she exerted unauthorized control over the charity's financial accounts. Did they authorize her to pay her utility bills? Well, that's a question that was asked to Mr. Zekin, Pathways Treasurer, and he said that he did not know if the Provincials, if she spoke to them, they would have authorized her to reimburse herself in that kind of manner, if she would have been allowed to use the charity's accounts to pay back, pay herself back for any expenditures she would have made for the charity. The state's entire case rested on Mr. Zekin's testimony, and he testified that he looked over the financial documents and he identified the transactions that he determined were unauthorized, but his testimony was insufficient to prove that any of these actions were unauthorized because he specifically testified that his conclusions were based on assumptions and educated guesses. In fact, every time he was asked whether or not Ms. Reed would have had the authority to either take cash advances or write checks to herself or pay personal expenses, his exact answer was, quote, not to my knowledge. He was asked multiple times, and each time he responded, not to my knowledge. What he did testify to was that in order for him to actually know if Ms. Reed's actions were unauthorized, he did not do. He even acknowledged that she would have been entitled to reimbursements and that she made for the charity, and he did not know whether the provincials told her she could pay herself back. Okay, I have a question about bank accounts. Ms. Reed was the executive director of the organization. Was she the one who should have opened a bank account for the organization? She actually, you know, this is actually an important fact. She couldn't open this bank account for the organization. Mr. Zeekand is the one who opened it, and it's very telling that Pathways Charity was founded in March of 2004, and despite repeated requests to Mr. Zeekand, a bank account for the charity was not opened until June of 2004, and so in the meantime, it fell upon Ms. Reed to pay for all of the charity's needs, whether it be utilities or salaries or insurance and any of that, out of her own pocket, but getting back to the first issue of the directed verdict, the state just failed to present any evidence that she was not on, that she was unauthorized to take any of these actions. Mr. Zeekand's testimony was completely inadequate, and as testified himself, he did not have personal knowledge of whether or not she had authority to do these things. Ms. Palacio, did the state provide evidence of the relationship between the Pathways Board and the provincial boards? I know there was a lot of discovery debate over the bylaws for the Pathways Board and what they were authorized to do. Did the state present any evidence about what authority was granted to that board of directors? Outside of Mr. Zeekand's testimony, no, and that's the entire problem with the state's case in chief. Their entire case was based on Mr. Zeekand's testimony, and all he testified to was that, to his knowledge, she would not have been authorized to do this, but that in order to gain knowledge, he would have had to ask the provincials, who are the board of trustees, and he did not do this. I'm sorry, go ahead, finish your answer. Without this testimony, there was simply insufficient evidence to support a guilty verdict, and therefore, the trial court erred when it denied the defense motion for a directed verdict. Would the fact that whether the checks were authorized or not authorized, wouldn't that be an affirmative defense by the defendant that you would necessarily have to prove that you had permission to cast certain checks? I think this goes to argument two, but no, it's not an affirmative defense, such as self-defense or entrapment or something like that. The state had the burden to prove these thefts beyond a reasonable doubt, and it simply didn't do it. The defendant did not have a burden to then present evidence to prove these thefts beyond a reasonable doubt that they were unauthorized or authorized. I agree with that, but whether or not there was an authorization, whether or not there was a specific permission to use the checks in the way she was using the checks, wouldn't that be an affirmative defense? I don't believe it is. I think she could have relied on the sufficiency of the evidence in saying that the state did not prove the required elements of these thefts beyond a reasonable doubt. I think we can, again, look at just the way this organization, if we're moving on to argument two, was run in such a way that from the very beginning, Ms. Reed was informed that she would get little oversight or help from the board of directors, and she had to take the initiative, whether it was paying for all the bills up front for herself and then reimbursement, which Mr. Zekin did not have any idea of how reimbursements are run. So it's certainly not out of the realm of possibility that she started by paying things out of her own checkbook or her personal account and then was being reimbursed from pathways in whatever way that she deemed or the provincials deemed fit. And so this was just a precedent that was set from the very beginning, and the state simply presented no evidence that there was anyone telling her that she could not do this. And if we're going to go back to Mr. Zekin, he, as the treasurer, he opened up this account. He certainly had access to all of these bank deposits, and there was nothing, he didn't say anything about her, the way she was running this organization until 2010. This was something that had been going on since 2004. And while I'm not saying it's the ideal way to run an organization or a charity, there is nothing to say that this precedent was not set, and therefore there was not tacit or implicit authority given to her to do these things. Indeed, there was never any argument that anyone was upset with the way she ran this with the services she gave to these victims. If anything, all the provincials said that she did a great job. She got effusive reviews every time they talked about how she was doing. And Mr. Zekin, as the treasurer, would present financial reports to the board about how the organization was running, and at no point did he indicate that there was anything suspicious about the way she was using the funds, using the credit cards, using the checks. There simply was not any evidence presented that any of the actions that she had taken were not authorized or that she was told she was prohibited. Would you agree that there would be a need for an authorization to use the checks in the manner that she did use them for personal matters? I would argue that that would be ideal, but again, we don't know. I'm not talking about would it be necessary that there would be an authorization to use the accounts not only for business or normal activities, but also for her personal matters. I don't think the state presented any evidence that showed that the boards required this, but again, there's also no evidence that she was not granted authorization from any of the provincials who, according to the board president, they were the ones who truly were in charge of the money. As he said, it was their money. So if Mr. Zekin is saying the only people who really know whether or not authorization was given was the provincials and no provincials were asked, I don't know how the state can prove beyond a reasonable doubt that any of these actions were done without authority. Well, see, and that's, I guess, the question I have is wouldn't that be the defendant's burden to show there was authorization? I don't think that there's an affirmative, that the burden shifts to the defendant and she needs to prove this, but I think that just the facts of the case can show that there could have been like an implicit or a tacit authority given to her because as the court itself recognized, she was kind of just given wide latitude and free reign. And it simply appeared as if the board of directors really was not interested specifically on how she was running things so long as the provincials and the clients were happy. There was never any indication that she was not allowed to do this. And when it comes to cash advances, there was no evidence at all that she wasn't allowed as a signatory of that bank card to do this. The state simply failed to meet its burden of showing that any of these actions were not authorized. This is an essential element of theft and the state simply failed to prove it. Did the state offer any testimony or any evidence that the pathways, the local board was authorized to set any policy or to make, you know, were they supervisory or were they advisory in nature? Because there's the two operating boards. No, the state didn't provide any evidence like that beyond Mr. Zekin's testimony. So, you know, where his testimony again, and I hate to repeat this over and over again, was that just to his knowledge, he did not know. And that his further testimony is that the provincials would be the one who would know and they were not asked. The state failed to meet its burden of proving these thefts beyond a reasonable doubt. To conclude, pursuant to the state's evidence in its case in chief was insufficient to prove the elements of theft beyond a reasonable doubt and the trial court erred in denying the defense motion for a directed verdict. Pursuant to argument two, the state failed to prove Jennifer Reed guilty of theft by writing checks without authority or by exerting unauthorized control over Pathways financial accounts beyond a reasonable doubt. Accordingly, this court should reverse and vacate Ms. Reed's testimony. Thank you, Ms. Palacio. Mr. Gnadovich? May it please the court. My name is Gary Gnadovich. I am a staff attorney with the State's Attorney's Appellate Prosecutor's Office. Good afternoon, Your Honors. Good afternoon. I guess one of the things I want to start out with is the fact that I'm not going to in any way try to take and justify how Pathways was operated. But what I keep hearing here from defendant is how Pathways was run, how it was operated, and somehow that this somehow justifies defendant's actions and how it was run. To answer a couple of the court's questions to begin with, there were two levels of management. There were the Provincials and there was the Board of Directors. The Provincials were in charge of the money and the Board of Directors were in charge of the day-to-day operations. I'm sorry, I don't have a record site, but that is in the record that was testified to in the state's case in chief. Let me take a look at, I want to take an address, if you will, the sufficiency of the state's case and its motion for directed verdict, which the people do believe the propriety of that has been waived because the general rule is that when defendant moves for a directed verdict, which is denied, but then turns around and presents evidence, without renewing the motion, that waives any propriety in the directed verdict. What that basically does, the importance of that is, I guess, it's what this court can look at. When the court looks at a directed verdict, like it was originally made, it's a sufficient to state's case. That's all you look at. Once the defendant presents evidence without renewing the motion, you can not only look at the state's case, but you can also take a look at the defense case and what the defense evidence presented. That's all we're really talking about here with respect to Didn't the defense put that in writing in their closing? I submit that closing argument is a tad bit late. The rule says at the close of the evidence. And that, if you take a look at the close of the state's case, the defendant made an immediate motion for a directed verdict. That was not done here. That could have and should have been done. The fact that it's in a closing argument, written or not, I don't think is adequate. That's when it was renewed. I thought it was originally made, denied, and then was renewed and it's closing argument. I don't look at it as being renewed and closing argument. It has to be renewed at the close of a case. So once the state's rebuttal case was done and the evidence was closed, at that point, the motion should have been made at that point. But even if we go beyond that, even go beyond that, when you take a look at the argument here for directed verdict, and you take a look at the reasonable doubt, it all comes down to one issue and one issue only, authorization. That's the whole basis of defendant's argument. And then we get into who has to prove what. Okay, so first of all, with respect to the state's case in chief, I will direct the court to R-379 of the record, R-431 of the record, and R-433 of the record. In those three spots, Zekun testified that at no point was defendant given permission to use the Pathway to Hope's personal or Pathway to Hope's checking accounts or credit card accounts for a purpose to pay her own personal expenses. This is what we're getting to. Didn't he testify that he didn't authorize that, that he hadn't given that authority? He testified that to his knowledge, she did not have permission to do that. But if he isn't the person with the ability to give that permission, how can he? He doesn't have to be the one to give that permission. It's a question of whether or not she, whether or not, whether or not he knew or had a reason to know that she had been given that. And to his knowledge, she had not. But what is also interesting in the testimony is that at R-456 and R-457 of the record and R-465, the decision to bring suit or to go to the authorities, first of all, came from the Board of Trustees and the provincials and their recommendations. But what is even more, I think, interesting and kind of answers the question of the defense here is the fact that at R-475 and R-476, testimony was presented that the same group, the same 15 provincials who would normally have given permission and authority to, for her to pay her personal bills, is exactly the same group who decided and authorized to have charges filed against her, which I think clearly indicates that the 15 provincials who would have given permission, if they had given permission, certainly wouldn't have authorized them to take and bring forth and and have charges filed against the defendant. To me, that's counterintuitive to suggest that the same 15 who would give her permission, if they had given her permission, are the same 15 that would take and file charges against her for basically using funds that she wasn't authorized to use. How was that proven during the trial, that statement you just made? That came, all the testimony came from Zekun and Zekun was present at the meeting when all of this transpired. They had, apparently there was a meeting of the Board of Directors as well as the provincials and that at that particular meeting, the 15 provincials all agreed or voted however it was to be categorized, stated how they did it. They basically all voted to take and have the charges brought against her, which to me indicates that none of the provincials that were there who would have given her permission had. And the other thing to take a look at, and we're going to take a look at the defendant's case, is there was a lot of testimony from her, about authorized charges, authorized charges about what had been done with particular accounts of particular individuals. The thing to remember is that the provincials were the definition of these various groups. The provincials were as a superior of a group of priests or brothers. The client was the church, the victims were the people that they were trying to serve. So all of her testimony, when she talks about having authorization, all of that authorization she spoke about were for services provided to the victims on behalf of the client by the defendant. Well, that is exactly, and that's the reason why you'll see testimony after testimony in the defendant's case about this was authorized, ran it by Father So-and-so, it was supposed to be. But the question is, where is the evidence that she ran by the fact that I got authorization to pay my NICOR bill? I got authorization to take cash advances. But by the same token, where did Mr. Zakin's testimony that she did not have that authority, what is the basis of his authority to testify? It's because he, as the treasurer, she basically answered to him. The board of directors, which she was a part of, ran the day-to-day operations. She answered to him. But the actual, how the dynamics worked and the authority of was that presented as some type of evidence as to their, you know, the bylaws or what authority had been granted to the Pathways Board. My understanding is that was tied up in a discovery dispute because I don't know what authority the provincials granted to the Pathways Board. I know that you said that they were to handle day-to-day operations, but the money was to be paid to the provincial boards. Generally, when they pass that authority down, they usually create the local boards as advisory in order to get local input, a face of the community, rather than decision-making authority. So where is the evidence that the provincials had vested the Pathways Board with any type of authority to act that didn't come from them? When you say authority to act, in what, authority to act how? If they were to take and run the day-to-day operation, I would certainly think that, and of course, it was established, it was established that the defendant was supposed to write the standard operating procedures for how things were run, and there was some evidence that was presented on how she wrote it, and how she wrote it, she never followed it. But the point is, I think, that she didn't have the ability to take and write checks on her own for her own reimbursement, and I don't think she had that authority, and I don't think it was the state's case to establish, to actually call the provincials, because like I say, the provincials were the ones that granted the, was the supervisor of the group, and they were the ones that approved, they approved the services, and that's all that we have in evidence, and basically, Zekund, he, I think, was in a position, because of his relationship with the board, with the provincials, with that board of trustees, he had that ability, and to his knowledge, okay, to his knowledge, he was able to testify that she did not have that authority. Now, this gets down, I think, to a question about a burden. It is the people's burden of proof to establish that, and I think that that testimony of his, that based on his knowledge and his relationship as the trustee, and how the pathways was run, that knowledge is sufficient to establish unauthorized conduct. At that point, and once the trial judge made that finding at the close of the state's case, not the burden of proof, but a burden of persuasion shifted to the defendant, and as I tried to explain, she tried to take and carry that burden of persuasion by showing how much everything was approved, but everything was approved for the keeping, but there's no testimony that she ever had the approval to be able to compensate herself or to reimburse herself for whatever expenses she may have paid on behalf of Pathways, and I think it was just as Carter brought out, it is akin to an affirmative defense. It is something that definitely means, as part of the defense case, is something that would present it, because if she had, if she had the authorization, it only stands to reason that she would have brought it forward, and she didn't. Mr. Geninovic, how was she supposed to pay these bills when she went to them and was there, and what was the mechanism, the authorized mechanism for her to do that? From what I can remember from how this was set up, when she provided a service, what she would do is she would receive notification from a provincial. She would then find out where the client was. She would contact the client, either by phone or many times would personally travel, would meet with that client, would find out what the client was looking for. She would then make offer of certain services or certain actions. She would then take and contact the provincial. She would get that approval. What she would do then, I believe she would create some sort of a memo or some sort of a document establishing what it was that she did, and I think also with the payments and things like that, with respect to whatever happened, and that would go in the client file. It would then bill or show to the provincial the service that was rendered to the client, as well as a separate statement as to the services she provided that the provincial was supposed to pay. Where did the money come from for the service? The money would take and come from the Pathways to Hope. Where did the money come from? Was there a bank? Well, the money, the original money came from the seed money from what the provincials put in. Mr. Knutovic, how did the service get paid for? She would either write a check. On what? On the Bank of America bank account. That belonged to whom? Pathways. And that was in place all of the time? Well, that, no, that, like I said, that was, no, that was not in place from February, right, and I don't know the services that were rendered from February to June, and I don't know how those, I don't know why, and there was never any evidence as to why it took so long for that bank account to open, and as well as nobody ever suggested that she was not entitled to reimbursement. It's the manner in which it was undertaken. Okay, I'm just, I'm trying to get a picture of the practical way that this was all going forward. They authorized her to provide a service that had to be paid for. There was no account from which that payment could be taken. Were they authorizing her implicitly to pay that from her own account or her own sources and get reimbursed for it? I would say, no, there was no implicit for her to pay out of her own account. Then what was she supposed to do? What were they authorizing her to do in terms of making that payment? They authorized her to take and provide a service. They were delinquent, is a word that comes to mind, in establishing that bank account and getting that money and getting it open to the point where she would use it, but I don't think that she was implicitly authorized to take and pay for services out of their own pocket, and the reason why I say that is because everybody, when I say everybody, the president who testified, the president of the trustees who testified, he was totally shocked and did not know that a bank account had not been open in that period from February to June. So I just think that, and again, I don't know, I have no idea where the pitfall came. I have no idea where the ball was dropped in all of this, except for the fact that I don't think that, at least in general practice, I don't think that one would take and use their personal account to pay for business expenses and business services. We're not talking about general practices. I understand. We're talking about this case with these facts. And you're talking about- Where was she supposed to pay that from? She wouldn't be able to pay it, and so she wouldn't have been able to provide the services, and she would have to take and basically contact the provincials and tell them, there's no money here to take and pay. How am I supposed to pay for these? Why would she take and, in my mind, and you were looking, you had asked about the reality of the situation, how the reality would be. Well, in reality, I don't take and see how implicitly she would be suggested to take and think that she would have to pay for these services for an organization that she was hired to take and run. Out of her own pocket. I don't- Yes, the individual who testifies on behalf of the state is the one that was in receipt of funds that didn't belong to him and didn't open a bank account for almost six months. Again, I- Holding on to money that wasn't his own. I have no idea where that money was. I have no idea how that money was held. I have no idea of the state. There was just absolutely no evidence presented as to why that bank account was not open. It was just established that it wasn't. Frankly, it does leave a question mark as to why that wasn't. But again, even speaking to that, it's still, I think, nonetheless, a question of even if she paid for those, and even if she was titled to reimbursement, how was that reimbursement to take place? And how did you take and balance the books when you don't have any receipts, you don't have anything that they asked her to bring forth before all of this even happened? Nothing at all is brought forth to take and establish or to take and show any kind of balancing of the books here that to what she did was balanced by what she paid. Did she ask to have a bank account opened? I believe there was testimony that she emailed, but there was also testimony that the emails weren't received. And then there was also testimonies that the emails that were there were not the actual emails, but they were more of some kind of an email file. And I'm not exactly sure how that is, but supposedly somehow you can create it, but you don't actually have an email that was truly sent. So there's countervailing evidence on both sides of this communication aspect about what was going on. But there is some evidence that she asked to have bank accounts open or a bank account open. Yes, there is evidence that the defendant testified to that. And like I say, there was evidence in rebuttal that basically sought to rebut that. I see that my time is up. So if there's any other questions. I'm supposed to do that, not you. I just, I read the thing, I saw the red light. Are you just tired of answering the question? No, not at all. This is kind of a unique situation, kind of a unique experience for me. I'm kind of, this is okay. It is, we're all kind of feeling our way. Okay, thank you. Thank you, Your Honor. Ms. Palacio, any rebuttal? Yeah, just very short in rebuttal. As to the directed verdict, we maintain that it was not waived. A motion for directed verdict was made at the close of the state's evidence. And then it was renewed at closing arguments in the memo, where it specifically says, please reconsider the motion for directed verdict. So in that case, just looking at the state's case in chief, the only thing we have is Mr. Zekin's testimony. And Mr. Zekin's testimony is that he could not know, have actual knowledge of whether or not Ms. Reed was authorized or unauthorized to do these things without speaking to the provincials. And he did not do that. And if we're gonna look at, you know, proceeding with this lawsuit in the first place, the state said that, you know, Mr. Zekin was present when the provincials voted to proceed. But he also testified he did not know if the provincials authorized or unauthorized any of these things. If they had said so in this meeting, he would have been able to affirmatively say the provincials said that these were not authorized actions. And he did not say so. He said he did not know. He said it's educated guesses. He said it was assumptions. And then moving to the second argument, just about whether the state met its burden of proving this case beyond a reasonable doubt, I think we're just kind of tiptoeing around the elephant in the room, which is that, you know, something about this charity was a little bit unsavory. You know, while its purpose was, yes, to help victims of sexual abuse, the court recognized, and everyone who testified recognized that this was also a way in which the church was working to try to keep certain victims from maybe suing the church. And, you know, they also recognize that maybe some of these victims were taking advantage of the charity, trying to get money or any other services from them. So, you know, then Ms. Reed was dealt to deal with this, dealt to deal with the victims, dealt to deal with the payouts. I think as Father Bernard testified, he was glad that she was doing it because he didn't want to do it. And Mr. Zekin, he had all the ability to look at these accounts. He was the name on the Bank of America account. He could have looked at the bank statements. He would have seen all the cash advances. He would have seen the deposits. So either he turned a blind eye to these actions or by doing that, he's giving tacit approval to the way that she was running the organization. And I think what we showed here was that everyone was perfectly happy with how the organization was being run. The clients were being served. The provincials were having her deal with the clients. And, you know, no one, like we keep talking about this as if it's a theft, but there was also evidence presented at trial that, you know, this wasn't a one-way street. Whereas, you know, cash advances were being taken and deposits were being made. The defense presented evidence that Ms. Reed out of her own bank account and debit card had spent upwards of $200,000 of her own money. So this money was going back and forth. And while this is not, you know, like I said, an ideal way of running an organization, it's not an ideal way of doing reimbursements from the very beginning when it was started without a bank account. And yes, there is evidence of Ms. Reed emailing one of the provincials saying, I'm talking to Mr. Zekind about getting this bank account open. And I don't wanna be a troublemaker, but, you know, I've already started paying things out of my account. So we know from the very beginning that a precedent was set that, you know, sometimes these funds were gonna get mixed. Sometimes she was gonna pay things for herself, by herself, and then get reimbursed later. And the fact that there wasn't, you know, a formal reimbursement set up, you know, that is something that maybe the treasurer should have been aware of. He was aware of the fact that he went many months without setting up a bank account. How did he think anything was getting paid for? So to come back to it, I just think that there was no evidence presented at all, specifically about the cash advances, that this was something that she was not authorized to do. She was a executive director and the signatory on that card. There was no evidence that she was not allowed to use the cash advances that card allowed her to do. And as for the checks that went to her personal accounts, there's no evidence that she was not authorized to reimburse herself for payments that she had been making for this organization from its very inception, to pay herself back for all the steps that she had done already for Pathways. Again, because the state failed to prove these thefts beyond a reasonable doubt, this court should reverse her convictions. Thank you. Thank you. We thank both of you for your arguments this afternoon. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will stand in recess for a panel change.